1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**

For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

KOON CHUN HING KEE SOY & SAUCE
FACTORY, LTD.,

          Plaintiff,

  v.

EASTIMPEX, et al.,

          Defendants

_____/

No. C 04-4146 MMC

**MEMORANDUM OF DECISION;
FINDINGS OF FACT AND
CONCLUSIONS OF LAW**

In this action, plaintiff Koon Chun Hing Kee Soy & Sauce Factory ("Koon Chun")

alleges defendants L.A. Victory, Inc. ("L.A. Victory") and Joe P. Zhao ("Zhao")[1] sold

counterfeit goods bearing a mark owned by Koon Chun and bearing a design substantially

identical to Koon Chun's trade dress, thereby violating federal and state law.

On June 5, 2006 through June 9, 2006, the Court conducted a trial on Koon Chun's

claims against L.A. Victory and Zhao.[2]  Marc M. Gorelnik and Timothy R. Cahn of

Townsend and Townsend and Crew LLP appeared on behalf of Koon Chun.  Bernard

[1]In some instances, defendants have referred to the individual defendant as "Simon
Zhou, also known as Joe P. Zhou," (see, e.g., Defs.' Closing Argument and Brief, filed June
29, 2006, at 1:22), and, in other instances, as "Simon Zhao, . . . also known as Joe P.
Zhao," (see Defs.' Narrative of Witnesses, filed April 19, 2006, at 1:24-25).

[2]By stipulation of the parties, the matter was tried to the Court.  (See Stipulation and
Order Waiving Jury Trial and Consenting to Court Trial, filed April 11, 2006.)

1  Cooper appeared on behalf of L.A. Victory and Zhao.  Having considered the evidence

2  presented and the arguments of counsel, the Court finds and rules as follows.

3  **BACKGROUND**

4  Koon Chun owns incontestable and protectable U.S. Trademark Registration No.

5  1,410,790, specifically, "KOON CHUN SAUCE FACTORY and Design" ("Trademark").

6  (See Stipulated Facts, filed June 5, 2006, ¶¶ 1, 2, 5.)[3]  Koon Chun's hoisin sauce products

7  are packed and distributed in cans that bear the Trademark.  (See id. ¶ 3.)  Koon Chun's

8  hoisin sauce cans also bear a protectable design "featuring a distinctive script font with red

9  lettering and a yellow border in association with blue trapezoidal shapes with a yellow

10  background and a pink circular seal bearing a green and blue ancient Chinese wine glass"

11  ("Trade Dress").  (See id. ¶¶ 4, 5.)

12  Zhao is the President, sole officer, sole director, and shareholder, with his wife by

13  community of interest, of L.A. Victory.  (See id. ¶ 12.)  On April 28, 2004, L.A. Victory

14  placed an order with Cheuking Development ("Cheuking") for hoisin sauce, and

15  subsequently purchased from Cheuking a total of 14,650 six-can cartons (87,900 cans) of

16  hoisin sauce, (see id. ¶¶ 6, 9, 13); the cans came from the "same source" and bore a name

17  and design that was the same as, or substantially indistinguishable from, Koon Chun's

18  Trademark and Trade Dress.  (See id. ¶¶ 7-8).  After the hoisin sauce was imported into

19  the United Sates, L.A. Victory sold the cans to companies in the United States during the

20  months of June, July and August 2004.  (See id. ¶ 17.)[4]

21  In the operative pleading, the Second Amended Complaint ("SAC"), filed December

22  6, 2004, Koon Chun alleges the hoisin sauce L.A. Victory imported and thereafter sold was

23  counterfeit Koon Chun hoisin sauce.  Based on such allegation, Koon Chun asserts eight

24  claims for relief against L.A. Victory and Zhao:  (1) "Federal Registered Trademark

26  [3]The parties' Stipulated Facts was admitted at trial as Exhibit 379.

27  [4]The parties' Stipulated Facts includes two paragraphs enumerated ¶ 15 and
28  separated by a paragraph enumerated ¶ 16.  (See id. at 2:23 - 5:16.)  For purposes of
clarity, the Court refers to the second ¶ 15 as "¶ 17."

2

1   Infringement (15 U.S.C. § 1114)"; (2) "Federal Counterfeiting (15 U.S.C. § 1116)";

2   (3) "Federal Trade Dress Infringement (15 U.S.C. § 1125(a))"; (4) "Federal Unfair

3   Competition (15 U.S.C. § 1125(a))"; (5) "Unfair Competition and Unfair Business Practices

4   (Cal. Bus. & Prof. Code §§ 17200 et seq.)"; (6) "Unfair Competition California Common

5   Law"; (7) "Trademark Infringement (Cal. Bus. & Prof. Code §§ 14335 et seq.)"; and

6   (8) "Trademark Infringement California Common Law."

7                                              **DISCUSSION**

8   **A.  Liability**

9           To establish a federal trademark infringement or federal unfair competition claim, a

10  plaintiff must establish the defendant's use of a "mark confusingly similar to a valid,

11  protectable trademark of [the plaintiff]," see Brookfield Communications, Inc. v. West Coast

12  Entertainment Corp., 174 F. 3d 1036, 1046 (9th Cir. 1999); put another way, the plaintiff

13  must show the "similarity of the marks is likely to confuse customers about the source of

14  the products," see id. at 1053.[5]  Similarly, to establish a federal claim of trade dress

15  infringement, the plaintiff must establish "its trade dress is protectable and that defendant's

16  use of the same or similar trade dress is likely to confuse consumers."  See Rachel v.

17  Banana Republic, Inc., 831 F. 2d 1503, 1506 (9th Cir. 1987).  To establish a state law

18  trademark infringement or state law unfair competition claim, the plaintiff must meet the

19  "likelihood of confusion" test applicable in federal trademark infringement claims.  See

20  Mattel, Inc. v. MCA Records, Inc., 28 F. Supp. 2d 1120, 1144 n. 30 (C.D. Cal. 1998) (citing

21  cases), aff'd, 296 F. 3d 894 (9th Cir. 2002), cert. denied, 537 U.S. 1171 (2003).

22          Here, the parties agree that Koon Chun's Trademark and Trade Dress are

23  protectable.  (See Stipulated Facts ¶ 5.)  The parties also agree that the mark and design

24  imprinted on the subject hoisin sauce cans sold by L.A. Victory are the same as, or

25

26          [5]The plaintiff need not demonstrate the defendant acted with any particular intent.
27  See Coca-Cola Co. v. Overland, Inc., 692 F. 2d 1250, 1256 n.16 (9th Cir. 1982) (holding
    "lack of wrongful intent" not valid defense to claim of trademark infringement because
28  "determination of liability focuses on the objective fact of likely customer confusion and not
    on the subjective mental state of the infringer").

substantially indistinguishable, from Koon Chun's Trademark and Trade Dress imprinted on genuine Koon Chun hoisin sauce cans.  (See id. ¶¶ 3, 4, 8).  Under such circumstances, a likelihood of confusion is established, unless the hoisin sauce cans imported by defendants were, in fact, genuine Koon Chun products.  See Brookfield Communications, 174 F. 3d at 1056 (holding where "virtual identity" between marks used by plaintiff and defendant exists, "likelihood of confusion would follow as a matter of law"); Philip Morris USA, Inc. v. Shalabi, 352 F. Supp. 2d 1067, 1073 (C.D. Cal. 2004) (holding "counterfeit marks are inherently confusing").

In that regard, Koon Chun has offered evidence that its representatives examined cans traceable to each shipment of the subject hoisin sauce,[6] and determined each examined can was not a genuine Koon Chun product.  According to Koon Chun's analysis, the examined cans differed from genuine Koon Chun hoisin sauce cans in small ways that would not be noticeable to most consumers, specifically, the number "1" having a different font, (see Transcript of Proceedings ("Tr.") 93:20 - 95:10), the letter "S" having a different font, (see Tr. 103:20 - 105:2), the space between "C" and "h" in "Chun" being larger, (see Tr. 95:19 - 96: 23), a different shade of pink appearing in the background, (see Tr. 105:10 - 106:15), a Chinese character being differently reproduced, (see Tr. 101:6 - 102:9), and the time stamp being more widely spaced, (see Tr. 107:19 - 108:8).  Further, Koon Chun's representatives analyzed boxes in which cans L.A. Victory sold to its customers were packaged, and determined those boxes had "glob-like" applications of glue, in contrast to boxes used by Koon Chun, which have four discrete glue lines.  (See Tr. 53:8 - 54:3; Tr. 88:8 - 91:12).  Defendants offered no evidence to the contrary.  Accordingly, the Court finds the cans examined by Koon Chun are counterfeits.

Koon Chun submits that the Court can infer all the hoisin sauce cans sold by Cheuking to L.A. Victory were counterfeit.  Defendants argue such inference is not

_____

[6]After L.A. Victory ordered the cartons of hoisin sauce from Cheuking, Cheuking, at L.A. Victory's direction, shipped the cartons to four different ports, specifically, Oakland, Los Angeles, New York, and Miami.

1    reasonably drawn because only a small amount of the overall number of cans imported by

2    L.A. Victory were examined by Koon Chun.  In essence, defendants appear to be arguing

3    Koon Chun has failed to show genuine cans were not intermixed with the counterfeit cans

4    imported by L.A. Victory.

5           The parties stipulated that all of the hoisin sauce imported by L.A. Victory came from

6    the "same source," (see Stipulated Facts ¶ 7), i.e., Cheuking, which, as discussed above,

7    was the "source" that sold the counterfeit goods examined by Koon Chun.  Cheuking stated

8    on the "Packing List" associated with each shipment that it was shipping the hoisin sauce to

9    L.A. Victory from Hong Kong, (see Exs. 348-E, 349-B, 350-B, 351-B), yet, according to the

10   "Arrival Notice/Freight Bill" associated with each shipment and prepared in each instance

11   by a third party, Cheuking actually shipped the goods from a port in China, (see Exs. 348-I,

12   349-D, 350-E, 351-I).  Defendants offer no explanation for why Cheuking would attempt to

13   conceal the port at which the goods were loaded, conduct which hardly correlates with the

14   shipment of legitimate goods.  Defendants also offer no evidence to dispute Koon Chun's

15   showing that Koon Chun only produces goods in Hong Kong, (see Tr. 10:3-5, 174:12-14),[7]

16   that Koon Chun only sells its products to Hong Kong trading companies, (see Tr. 10:15-24),

17   and that it would cost a Hong Kong trading company more to purchase Koon Chun

18   products in Hong Kong, ship them to China, and then ship them to the United States, rather

19   than shipping them directly from Hong Kong, (see Tr. 125:17-126:6), all of which evidence

20   tends to prove Cheuking did not ship genuine Koon Chun products intermixed with the

21   counterfeit products it shipped.

22          Under the circumstances, the Court finds Koon Chun has demonstrated, by a

23   preponderance of the evidence, that the entirety of the cartons of hoisin sauce sold to L.A.

24   Victory by Cheuking, and thereafter imported by L.A. Victory into the United States, was

25   counterfeit Koon Chun hoisin sauce, and, accordingly, that L.A. Victory is liable for

26   infringing Koon Chun's Trademark and Trade Dress and for unfair competition.

27   _____

28          [7]Although Zhao did testify that he had "evidence right now showing that Koon Chun
     manufactured in China," (see Tr. 511:18-19), no such evidence was produced at trial.

5

1   Further, given that Zhao, the sole officer and director of L.A. Victory, is the only party

2   who acted on behalf of L.A. Victory with respect to the purchase, importation, and sales of

3   the counterfeit Koon Chun hoisin sauce, the Court finds Zhao likewise is liable for such

4   infringement and unfair competition.  See Transgo, Inc. v. Ajac Transmission Parts Corp.,

5   768 F. 2d 1001, 1021 (9th Cir. 1985) (holding corporate officer or director is "personally

6   liable for all torts which he authorizes or directs or in which he participates, notwithstanding

7   that he acted as an agent of the corporation and not on his own behalf"; finding officer of

8   defendant corporation liable, along with corporation, for unfair competition, where officer

9   played "instrumental role" in corporation's passing off plaintiff's goods as those of

10  defendant corporation).

11  **B.  Remedies**

12  The remedies available under federal law for trademark infringement and unfair

13  competition are injunctive relief, see 15 U.S.C. § 1116(a), as well as "(1) defendants'

14  profits, (2) any damages sustained by the plaintiff, and (3) costs of the action," see 15

15  U.S.C. § 1117(a).[8]  Further, as an alternative to a monetary award based on the

16  defendants' profits and the plaintiff's damages, the plaintiff "may elect, at any time before

17  final judgment is rendered by the trial court, to recover . . . an award of statutory damages."

18  See 15 U.S.C. § 1117(c).

19  Here, Koon Chun seeks permanent injunctive relief, defendants' profits, Koon

20  Chun's damages, and an award of attorney's fees and costs.  Koon Chun also requests

21  that the Court award Koon Chun the maximum amount of statutory damages available, and

22  provide Koon Chun an opportunity to elect an award of statutory damages or a monetary

23  award based on defendants' profits and Koon Chun's actual damages.

24  **1.  Injunctive Relief**

25  Koon Chun seeks an order converting the terms of the preliminary injunction, filed

26

27  [8]Koon Chun does not argue that it is entitled, by virtue of defendants' violations of
28  state law, to any additional remedy.

6

1    November 4, 2004, into a permanent injunction; additionally, Koon Chun seeks an order

2    that would "bar Zhao, and those entities and persons he controls, from ever handling or

3    dealing in Koon Chun products, either as importer, exporter, broker, distributor, wholesaler

4    or retailer."  (See Pl.'s Closing Argument, filed June 30, 2006, at 31:19-22.)  Finally, Koon

5    Chun seeks a "destruction order."  (See id. at 34:4.)

6         Defendants state they are not opposed to the Court's converting the terms of the

7    preliminary injunction into a permanent injunction.  (See Defs.' Rebuttal to Pl.'s Closing

8    Argument, filed July 13, 2006, ¶ 31.)  Accordingly, the Court finds Koon Chun is entitled to

9    such injunctive relief.

10        With respect to Koon Chun's request that Zhao be "barred" from "ever" dealing in

11   any manner with Koon Chun products, defendants argue Koon Chun has not articulated

12   any reason why a lifetime ban would be an appropriate remedy against counterfeiting,

13   which is the type of infringement and unfair competition established herein.  The Court

14   agrees.  Injunctive relief to remedy acts of trademark infringement or unfair competition

15   must be of a type that will "prevent the violation of any right of the registrant of the mark . . .

16   or to prevent [unfair competition]."  See 15 U.S.C. § 1116(a); see also Cal. Bus. & Prof.

17   Code § 14335(a) (providing defendant who "unlawfully infringes upon a mark registered

18   under [state or federal law], . . . shall be subject to an injunction against that use").  Koon

19   Chun has failed to identify any reason why prohibiting Zhao from engaging in lawful activity,

20   specifically, selling genuine Koon Chun products, would prevent Zhao from engaging in

21   acts of trademark infringement or unfair competition against Koon Chun.  Accordingly, the

22   Court finds Koon Chun is not entitled to such additional injunctive relief.

23        Finally, as noted, Koon Chun seeks a "destruction order."  The Court understands

24   Koon Chun to be requesting that any hoisin sauce defendants recalled and currently have

25   sequestered, under the terms of the Court's order of November 4, 2004, be destroyed.[9]

26

27        [9]The November 4, 2004 order required defendants to "recall from [defendants'] customers at Zhao's expense all 'Koon Chun' hoisin sauce sold by [defendants] between June 1, 2004 and November 4, 2004" and to "sequester all returned products pending

28   further order of the Court."  (See Preliminary Injunction and Recall Order at 3:7-8, 15.)

1   Defendants have not submitted a response to such request.  Given that any hoisin sauce

2   recalled under the terms of the November 4, 2004 order is a counterfeit product, the

3   requested relief is appropriate.  Accordingly, the Court finds Koon Chun is entitled to such

4   destruction order.

5          **2.  Defendants' Profits**

6          "In assessing profits the plaintiff shall be required to prove defendants' sales only;

7   defendant must prove all elements of cost or deduction claimed."  15 U.S.C. § 1117(a).

8          Here, L.A. Victory's sales are undisputed.  Specifically, L.A. Victory sold the

9   counterfeit hoisin sauce to five customers, as follows: (1) in June 2004, L.A. Victory sold

10  5200 cartons to Giant Union Co., Inc. ("Giant Union") at a price of $19.50 per carton, for a

11  total of $101,400, (see Stipulated Facts ¶ 17(a)); (2) in June 2004, L.A. Victory sold 4050

12  cartons to Yang Shing Trading, Inc. ("Yang Shing") at a price of $19.50 per carton, for a

13  total of $78,975,  (see id. ¶ 17(b)); (3) in July 2004, L.A. Victory sold 2700 cartons to

14  EBJ/Eastimpex Wholesale ("Eastimpex") at a price of $19.25 per carton, for a total of

15  $51,975, (see id. ¶ 17(e); Ex. M-1); (4) in August 2004, L.A. Victory sold 1350 cartons to

16  Fashion Import at a price of $20.50 per carton, for a total of $27,675, (see Stipulated Facts

17  ¶ 17(c)); and (5) in August 2004, L.A. Victory sold 1350 cartons to Southeastern Food

18  Supplies at a price of $19.00 per carton, for a total of $25,650, (see id. ¶ 17(d)).  In sum,

19  the total amount of the sales was $285,675.

20         Some of defendants' costs and deductions also are undisputed: (1) $136,100 in

21  payments to Cheuking, (see id. ¶ 15); (2) $51,053.51 in freight and customs charges, (see

22  id. ¶ 16); (3) $30 for a wire fee associated with the sale to Yang Shing, (see id. ¶ 17(b));

23  and (4) $19,635, which represents the uncollectible amount associated with 1020 cartons

24  seized from Eastimpex by the United States Marshal, (see Pl.'s Rebuttal Argument, filed

25  July 14, 2006, at 18:10-11.)  Consequently, the total amount of undisputed costs and

26  //

27  //

28  //

8

1    deductions is $206,818.51.[10]

2         The parties dispute whether defendants are entitled to one further deduction,

3    specifically, whether a $23,077.50 payment made by L.A. Victory to Cheuking should be

4    considered a payment toward the hoisin sauce.  L.A. Victory ordered the subject hoisin

5    sauce from Cheuking on April 28, 2004.  (See Stipulated Facts ¶ 13).[11]  Several weeks

6    earlier, on or about April 8, 2004, L.A. Victory paid $23,077.50 to Cheuking.  (See Tr. at

7    494:16 - 495:4.)  Defendants argue such payment should be deemed a payment for the

8    later-ordered hoisin sauce, relying on Zhao's testimony that the $23,077.50 payment

9    originally was for mushrooms and rice sticks, that such order was later cancelled by L.A.

10   Victory, and that L.A. Victory requested Cheuking apply the payment toward the hoisin

11   sauce order.  (See Tr. 494:16 - 495:10.)

12        According to Zhao, he cancelled the mushroom/rice sticks order L.A. Victory had

13   placed with Cheuking because "the price of the mushroom was too high, no, the quality

14   was bad."  (See Tr. 495:2-6.)[12]  If, by such ambiguous testimony, Zhao meant he cancelled

15   the order because the price of the mushrooms was too high, Zhao not only failed to explain

16   why he ordered and paid for mushrooms without initially determining the price of such

17   product, but, further, failed to explain why he would also cancel the order for rice sticks.  If

18   Zhao meant that he cancelled the order because he was dissatisfied with the quality of

19   goods, Zhao failed to explain the circumstances under which he formed such an opinion,

20

21        [10]L.A. Victory billed Eastimpex $51,975, (see Ex. M-1), and collected $31,877.50,
     (see Stipulated Facts ¶ 17(e)), leaving a balance of $20,097.50.  As noted, Koon Chun
22   concedes $19,635 of the balance is uncollectible, which leaves a remaining balance of
     $462.50, (see Tr. 434:14 - 435:10).  Although defendants assert the remaining balance is
23   uncollectible, defendants nevertheless "accept" such amount should be considered as
     having been "collected" by L.A. Victory for purposes of calculating defendants' profits.  (See
24   Defs.' Closing Argument and Brief at 27:12-22.)

25        [11]As noted, the parties agree L.A. Victory paid $136,100 to Cheuking for the hoisin
     sauce, (see id. ¶ 15); those payments consisted of a May 5, 2004 payment of $25,000, and
26   a May 10, 2004 payment of $111,100, (see id.).

27        [12]Prior to trial, defendants represented that Zhao would testify he cancelled the order
     for mushrooms and rice sticks for an entirely different reason, specifically, because "the
28   seller could not deliver."  (See Defs.' Proposed Findings of Fact and Conclusions of Law,
     filed April 14, 2006, at 2:25 - 3:3.)  Zhao did not offer that reason at trial.

1    i.e., when he, or someone on his behalf, examined the goods and rejected them.

2    Defendants also failed to offer any documentary evidence to support their theory that Zhao

3    rejected the mushrooms and rice sticks and received a credit from Cheuking.  Moreover,

4    Zhao's testimony that he originally paid $23,077 for mushrooms and rice sticks is itself not

5    supported by the only documentary evidence offered that pertains to such sale.

6    Specifically, Zhao's "personal ledger" refers to the $23,077 payment as "Paid Kwong

7    Tung's payment for 2x20' bean paste," (see Ex. 33 at 71, line 27; see also Tr. 480:5-13),

8    and contains no reference to an order of mushrooms or rice sticks from Cheuking.[13]  Under

9    such circumstances, the Court does not find Zhao's testimony on this point persuasive.

10   See 15 U.S.C. § 1117(a) (providing defendant has burden to "prove all elements of cost or

11   deduction claimed").

12        Accordingly, the Court will award $78,856.49 to Koon Chun, which is the difference

13   between $285,675, the amount of the sales made by defendants, and $206,818.51, the

14   total amount of costs and deductions established by defendants.

15        **3.  Actual Damages**

16        In a trademark infringement action, "[d]amages are typically measured by any direct

17   injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have

18   earned but for the infringement."  See Lindy Pen Co., Inc. v. Bic Pen Corp., 982 F. 2d 1400,

19   1407 (9th Cir. 1993).  "In assessing damages the court may enter judgment, according to

20   the circumstances of the case, for any sum above the amount found as actual damages,

21   not exceeding three times such amount."  15 U.S.C. § 1117(a).  In an action involving

22   counterfeit products, if the defendant intentionally uses the mark or designation "knowing

23

24        [13]In any apparent attempt to explain why his ledger referred to the $23,077 payment
     as being associated with "Kwong Tung" and "bean paste," Zhao testified Kwong Tung was
25   a Chinese province and that a man, unnamed by Zhao, went to that province to examine
     bean paste for L.A. Victory, and that such individual "looked at the quality of the bean
26   paste, that was not good, too."  (See Tr. 495:11 - 496:12.)  Zhao never explained how such
     unnamed individual's examination of bean paste in Kwong Tung related to Zhao's April 8,
27   2004 payment to Cheuking.  Indeed, Zhao, in referring to the examination of bean paste in
     Kwong Tung, testified, "I remember that Cheuking did not do this transaction.  That is, the
28   bean paste sauce"  (See Tr. 496:19-21.)

1   such mark or designation is a counterfeit," the court "shall, unless the court finds

2   extenuating circumstances, enter judgment for three times [the defendant's] profits or

3   damages, whichever is greater."  See 15 U.S.C. § 1117(b).

4                      **a.  Calculation of Actual Damages**

5         Koon Chun argues its damages consist of its lost manufacturing profits, the costs it

6   has incurred and will incur in taking corrective packaging measures, and the costs it will

7   incur to run corrective advertising.  For the reasons discussed below, the Court finds Koon

8   Chun has established its entitlement to actual damages in the total amount of $258,588.30.

9                      **(1)  Lost Manufacturing Profits**

10        As noted, L.A. Victory sold 14,650 cartons of counterfeit Koon Chun hoisin sauce to

11  customers in the United States, of which 1020 cartons were seized by the United States

12  Marshal.  As to the 13,630 cartons actually received by L.A. Victory's customers, Koon

13  Chun argues it lost the manufacturing profits it would have earned had L.A. Victory's

14  customers purchased genuine Koon Chun hoisin sauce.

15        Koon Chun has offered evidence that its manufacturing profit per carton is $11.76.

16  (See Tr. 375:13 - 377:4; Ex. 154 at 12), which amount represents the profit Koon Chun

17  realizes when it sells a carton to a Hong Kong trading company, which, in turn, sells the

18  carton to an importer.  Defendants have not disputed Koon Chun's evidence as to its profit

19  per carton sold, nor do they state an objection to Koon Chun's theory that Koon Chun lost

20  manufacturing profits as to customers that would have purchased genuine Koon Chun

21  products.  Defendants argue, however, that Koon Chun's theory should apply only with

22  respect to customers of L.A. Victory that have a prior history of buying genuine Koon Chun

23  products.  To the extent defendants, by making such argument, are contending that some

24  of L.A. Victory's customers bought the counterfeit Koon Chun hoisin sauce from L.A.

25  Victory for a reason other than the appeal of the Koon Chun trademark, defendants have

26  failed to offer any evidence in support thereof.  See Mishawaka Rubber & Woolen Mfg. Co.

27  v. S.S. Kresge Co., 316 U.S. 203, 206 (1942) (holding "if . . . some purchasers bought

28  goods bearing the infringing mark because of the defendant's recommendation or his

11

1    reputation or for any reason other than a response to the diffused appeal of the plaintiff's

2    symbol, the burden of showing this is upon the poacher").  In the absence of any such

3    evidence by defendants, it is reasonable to infer, and the Court does infer, that sales of the

4    13,630 cartons represent lost sales to Koon Chun, or, more specifically, represent Koon

5    Chun's having lost sales to Hong Kong trading companies that would have sold genuine

6    Koon Chun hoisin sauce to L.A. Victory's customers through normal channels.  See, e.g.,

7    Ford Motor Co. v. Kuan Tong Industrial Co., 697 F. Supp. 1108, 1109 (N.D. Cal. 1987)

8    (holding "sale made by the infringing party is presumed to be a lost sale to the trademark

9    owner").[14]

10    Accordingly, the Court finds Koon Chun has established it lost manufacturing profits

11    in the amount of $160,288.80 (13,630 x $11.76).

### (2)  Corrective Packaging Measures

13    Koon Chun asserts that its damages include the costs it has incurred and will incur

14    to place laser-engraved labels on its products, as well as certain stickers on packing boxes,

15    to combat counterfeiting.  Defendants do not disagree that Koon Chun may be awarded

16    such expenses, but dispute the amount sought by Koon Chun.

17    As to expenses previously incurred, Koon Chun has offered evidence, undisputed by

18    defendants, that Koon Chun paid $98,910 to purchase two laser-engraving machines and

19    paid $679 to design an anti-counterfeiting label for placement on its products by the laser-

20    engraving machines, for a total of $99,589.  (See Ex. 154 at 13.)  Initially, Koon Chun

21    sought to recover the cost of both machines, and defendants, in their closing argument,

22    argued that because Koon Chun purchased the first of those machines before defendants

23    had sold any counterfeit Koon Chun products, 50% of the $98,910 expense for the

24    machines should not be considered as damages attributable to defendants.  In its rebuttal

25    argument, Koon Chun, although not agreeing with the reasoning offered by defendants,

27    [14]The parties disagree as to which of L.A. Victory's customers have a prior history of
28    purchasing genuine Koon Chun products.  The Court finds it unnecessary to resolve this
issue.

1    nevertheless "concede[s]" it will only seek in the instant action 50% of its corrective

2    packaging expenses,[15] (see Pl.'s Rebuttal Argument at 14:6-11), specifically, $49,794.50 of

3    the costs previously incurred.[16]

4          As to prospective expenses, Koon Chun has offered evidence, undisputed by

5    defendants, that the annual cost to purchase the subject labels is $6974, and the annual

6    cost to purchase the subject stickers is $8348.  (See Ex. 154 at 13 and Exs. F and G

7    thereto.)[17]  Koon Chun argues it will be required to incur such costs for five years, relying

8    on the testimony of Raymond Chan ("Chan"), Koon Chun's Regional Manager - Americas,

9    who, when asked to "estimate" how long he believed such anti-counterfeiting measures

10   would be necessary, offered the opinion that such measures would at a "minimum" be

11   necessary for five years.  (See Tr. 120:7-17.)[18]  Those recurring costs, over five years, total

12   $76,610 ((6974 + 8348) x 5), but, as noted, Koon Chun has elected to seek herein 50% of

13   the corrective packaging expenses, i.e., $38,305.

14         Defendants argue Chan's testimony is too speculative to support a finding that Koon

15   Chun will need to use the subject labels and stickers for five years.  As the Ninth Circuit has

16   recognized, however, although "[p]rospective costs may be difficult to determine precisely

17   and present a danger of overcompensation if they exceed the value of the mark[,] . . . the

18

19         [15]Koon Chun represents it will seek the other 50% from parties against whom Koon
     Chun is proceeding in New York.

20         [16]Defendants also argue that because Koon Chun did not establish that the
21   machines are solely for use with Koon Chun's hoisin sauce products, i.e., that Koon Chun
     cannot use the machines in connection with other products, defendants should not be held
22   responsible for the entire cost of the machines.  There is no evidence, however, that Koon
     Chun could have purchased a less expensive machine that could be used only on hoisin
23   sauce cans.  Thus, even assuming, arguendo, that the machines can be used with
     products other than hoisin sauce, such additional use is not a ground to reduce the amount
24   of damages.

25         [17]Those figures were calculated by Koon Chun's accounting expert based on the
     annual amount of Koon Chun hoisin sauce sold in the United States.  (See Ex. 154 at 13.)
26   Accordingly, to the extent defendants argue that the projected expenses for labels and
     stickers encompass expenses associated with products other than hoisin sauce,
27   defendants are incorrect.

28         [18]According to Chan, his duties include "actively looking for counterfeits and handling
     counterfeits."  (See Tr. 141:23-25.)

burden of any uncertainty in the amount of damages should be borne by the wrongdoer."
See Adray v. Adry-Mart, Inc., 76 F. 3d 984, 989 (9th Cir. 1996).  Moreover, defendants do
not argue $38,305, or even $76,610, exceeds the value of Koon Chun's Trademark and
Trade Dress.  Consequently, the Court does not find the requested amount, $38,305, is too
speculative or presents an unnecessary risk of overcompensation.

The total amount of corrective packaging expenses sought by Koon Chun herein is
$88,099.50 ($49,794.50 + 38,305).  With respect to such amount, defendants argue they
should be responsible only for a limited percentage thereof, specifically, a figure derived by
dividing the annual amount of genuine Koon Chun hoisin sauce cans sold in the United
States by 87,900, the number of counterfeit cans sold by L.A. Victory in the United States.
As Koon Chun points out, however, apportionment based on such theory would mean Koon
Chun would bear the vast majority of the costs it incurred to combat counterfeiting;
defendants cite no authority for the proposition that one of the parties to whom a portion of
the plaintiff's damages should be apportioned is the plaintiff itself, at least where, as here,
there is no showing the plaintiff contributed to the defendant's having sold counterfeit
products.

Accordingly, the Court will award Koon Chun the sum of $88,099.50 for corrective
packaging expenses.

### (3)  Corrective Advertising

Koon Chun argues its damages include the costs it will incur to run corrective
advertising.  Specifically, Koon Chun envisions placing advertisements in twelve "Chinese
media" newspapers and "trade journals" that will "inform the marketplace what is happening
and how to distinguish the counterfeit products from the real one."  (See Tr. 123:16 -
125:13.)  Defendants do not deny that prospective corrective advertisement costs are an
appropriate remedy, but dispute that Koon Chun has adequately proven the costs it will
incur to run such ads.

Koon Chun asserts it will need a total of $148,104 to run the envisioned
advertisements.  In support of such amount, Koon Chun relies on Chan's testimony that he

14

1    received a written quotation from Sing Tao Daily, a publication in the San Francisco Bay

2    Area, stating the price to run a full-page advertisement therein for five days would be $2040

3    per day.  (See Tr. 124:14-25; Ex. 143 at KC0081.)  Koon Chun also relies on the expert

4    report of certified public accountant Thomas M. Neches ("Neches"), who, based on Chan's

5    testimony as to the cost of advertising in Sing Tao Daily, opined as follows: "Applying [the

6    rate of $2040 per day] to all publications, as well as an advertising agency and design fee

7    of 10%, I calculate that Koon Chun's corrective advertising will be $148,104 ((12

8    newspapers x 5 days + 2 trade publications x 3 days) x $2,040 x 110%)."  (See Ex. 154 at

9    14.)

10          Defendants argue that any cost other than for an advertisement in Sing Tao Daily,

11   specifically, $10,200 ($2040 x 5 days), is speculative.  As defendants point out, Neches

12   merely took a price quote Chan obtained from one publication and assumed that all other

13   newspapers and trade journals would charge the same amount.  Although, in response,

14   Koon Chun relies on the principle that any risk of uncertainty as to the extent of damages

15   should be borne by defendants, such principle is not applicable to the costs of prospective

16   advertising.  Unlike the situation involving anti-counterfeiting labels and stickers, where

17   there is inherent uncertainty as to the length of time such techniques will continue to

18   present effective obstacles to counterfeiters, there is little to no risk of uncertainty in

19   determining the price of advertising.  It is neither difficult nor expensive to obtain price

20   quotations from publishers.  The Court cannot assume the price charged by one publication

21   in the San Francisco Bay Area is the same as, or representative of, all other publications,

22   irrespective of their size, location, or other distinguishing factors, aimed at Chinese-

23   speaking readers or the trade.  Further, there is no evidence in the record that Koon Chun

24   would be subject to a 10% fee from an advertising agency and/or designer.  Because Koon

25   Chun had access to such proof, but did not obtain and present it, the Court declines to

26   award the requested costs of prospective advertising other than those associated with the

27   running of advertisements in Sing Tao Daily.  See, e.g., Lindy Pen Co., 982 F. 2d at 1408

28   (holding where plaintiff "had access through discovery to [defendant's] records from which

a reasonable estimate [as to defendant's sales] could have been accomplished," but plaintiff declined to avail itself of such access, plaintiff not entitled to award of defendant's profits).

Accordingly, the Court will award Koon Chun the sum of $10,200 ($2040 x 5) for prospective corrective advertising.

### b. Trebling

As noted, where a defendant has intentionally used a mark or designation "knowing such mark or designation is a counterfeit," the district court "shall, unless the court finds extenuating circumstances, enter judgment for three times [the defendant's] profits or damages, whichever is greater." See 15 U.S.C. § 1117(b). "To act 'knowingly' [ ] is not necessarily to act only with a positive knowledge, but also to act with an awareness of the high probability of the existence of the fact in question." See United States v. Jewell, 532 F. 2d 697, 700 (9th Cir. 1976). "[I]f the [plaintiff] proves the defendant was 'willfully blind' to the counterfeit nature of the mark, it will have met its burden of showing 'knowledge.'" See Louis Vuitton S.A. v. Lee, 875 F. 2d 584, 590 (7th Cir. 1989) (citing legislative history). Here, Koon Chun argues that defendants, at the time they sold the hoisin sauce L.A. Victory bought from Cheuking, knew the sauce was counterfeit; accordingly, Koon Chun seeks an award of treble damages pursuant to § 1117(b).[19] In so arguing, Koon Chun does not rely on direct evidence of such knowledge, but, rather, relies on circumstantial evidence.

Having reviewed the evidence submitted at trial, the Court finds Koon Chun has proven by a preponderance of the evidence that Zhao, and consequently L.A. Victory, acted with an awareness of the high probability of, or, at a minimum, was willfully blind to, the fact that the goods L.A. Victory purchased from Cheuking were counterfeit.

At the outset, Koon Chun cites to the price L.A. Victory paid to Cheuking for the

---

[19]As discussed above, Koon Chun has shown its entitlement to damages in the amount of $258,588.30, an amount that exceeds the $78,856.49 in profits realized by defendants.

16

1   goods.  Where a defendant purchases branded goods for a price far below the market price

2   for genuine branded goods, an inference is properly drawn that the defendant is, at a

3   minimum, aware of a high risk the goods are not genuine branded goods.  See, e.g.,

4   Microsoft Corp. v. Compusource Distributors, Inc., 115 F. Supp. 2d 800, 808 (E.D. Mich.

5   2000) (finding defendant "appeared to turn a blind eye to clear indications" it purchased

6   counterfeit Microsoft software, where, inter alia, defendant purchased "Microsoft" software

7   for $50, although market price for genuine Microsoft software was $85 price).

8          In the instant case, L.A. Victory purportedly prepared a purchase order, (see Ex. 78)

9   and Cheuking purportedly prepared invoices (see Exs. 348-A, 348-B, 349-A, 350-A), each

10  of which document includes a stated purchase price per carton of $17.70.  Given that Koon

11  Chun charges between $16.97 and $18.85 per carton, (see Tr. 47:7-22; Ex. 154 at 12), a

12  purchase price of $17.70 per carton would not, by itself, appear suspicious to the buyer.

13  L.A. Victory, however, never paid anywhere near $17.70 per carton; rather, as discussed

14  above, it paid the total sum of $136,100 for the 14,650 cartons shipped, i.e., $9.29 per

15  carton.  Although defendants argue Koon Chun has not shown that, at the time the parties

16  entered into the transaction, L.A. Victory intended to pay less than the stated price of

17  $17.70, the Court disagrees.

18         First, Zhao's highly confusing and contradictory answers to rather straightforward

19  questions about the ordering process, specifically, how he delivered the purchase order to

20  Cheuking and how he received the invoices from Cheuking, cast serious doubt on Zhao's

21  general credibility.  Zhao gave at least three conflicting answers to the former question,[20]

22  //

23  //

24

25

26  [20]The various versions were as follows: (1) Zhao "personally handed" the purchase
    order to a Michelle Chen ("Chen") of Cheuking, at a hotel in China, (see Tr. 347:16 -
27  348:4); (2) Chen came to Zhao's family's home in China where Zhao was then staying,
    and, although Chen then met with Zhao, Zhao's "younger sister" gave the purchase order
28  to Chen at that time, (see Tr. 348:10 - 349:17); and (3) the purchase order was faxed to
    Chen, either by Zhao directly or "through [his] sister," (see Tr. 350:14-19).

17

and at least two conflicting answers to the latter.[21]

Second, assuming that L.A. Victory, in some fashion, delivered the purchase order to Cheuking and Cheuking delivered the invoices to L.A. Victory, Cheuking's subsequent actions are not indicative of a company that ever expected to be paid the stated purchase price. L.A. Victory paid Cheuking a total of $136,100 for the ordered goods, specifically, a payment of $25,000 on May 5, 2004 and a second payment of $111,100 on May 10, 2004, leaving a balance due of $123,205. (See Stipulated Facts ¶¶ 14, 15.) In spite of that rather large outstanding balance, Cheuking thereafter, on various dates in May and June 2004, shipped the goods to L.A. Victory. (See Exs. 348-G, 349-D, 350-D, 351-E.) There is no evidence L.A. Victory provided, nor does Zhao contend he provided, any type of security for the outstanding balance. Thus, under defendants' theory, Cheuking shipped the goods on a mere promise by L.A. Victory that it would pay Cheuking $123,205, despite Cheuking's never having done any business with L.A. Victory previously. (See Tr. 325:6-8.)[22] Equally, if not more, significant is the absence of any evidence to suggest Cheuking took any steps to try to collect the "balance,"[23] which represented almost 50% of the total "purchase price."

Third, L.A. Victory's actions are not indicative of a buyer who ever intended to pay the stated purchase price. After the goods were shipped, L.A. Victory received for the hoisin sauce a total of $233,847.50 from its buyers in the United States. (See Stipulated

---

[21]Zhao initially testified he received the invoices by fax, (see Tr. 498:5-10), even though, as Koon Chun has observed, the invoices produced by Zhao bear no indicia of having been faxed, such as a fax header. Shortly thereafter, Zhao testified that "one time they asked a friend to bring [Zhao] a whole pile of invoices," (see Tr. 499:12-18), seemingly meaning that someone on behalf of Cheuking personally delivered the invoices to Zhao.

[22]At trial, Zhao testified that Chen was an acquaintance he did not know well, (see Tr. 323:13-17), thus eliminating the possibility that a familial connection or preexisting friendship might at least explain in part an otherwise aberrant business arrangement.

[23]The only evidence of any contact between L.A. Victory and Cheuking after the goods were shipped is Zhao's testimony that, on an undisclosed date in or after October 2004, when Zhao first learned of the instant action, Zhao received a call from Chen, at which time Chen advised Zhao the goods Cheuking had sold L.A. Victory were authentic. (See Tr. 636:3-9; 637:17 - 639:13.) Even as to that sole communication, there was no testimony Chen requested payment from L.A. Victory.

18

Facts ¶¶ 11, 17.)  Although that revenue, after deducting various shipping charges related to those sales and the $136,100 L.A. Victory paid Cheuking before the goods were shipped, would not have been sufficient to completely satisfy the $123,205 "balance," such revenue could have reduced that "balance" substantially, yet L.A. Victory made no further payment in any amount to Cheuking.  Further, there is no evidence that Zhao ever acknowledged in any way that L.A. Victory owed an additional $123,205 to Cheuking, for example, by requesting an extension of time to pay.  At trial, Zhao offered no explicit excuse for L.A. Victory's failure to pay any portion of that sum, and, to the extent his trial testimony may be understood to assert that a "cash flow"[24] problem precluded full payment, such theory does not account for L.A. Victory's failure to make any payment toward the claimed balance.

Finally, Koon Chun has shown that L.A. Victory would have known when it entered into the transaction with Cheuking that L.A. Victory would not make a profit on the transaction if the true purchase price was $17.70, and, consequently, there was no commercially reasonable basis for L.A. Victory to enter into the transaction as defendants purport it to be.  As noted, Zhao's freight and customs charges were $51,053.51, which represents a cost of $3.48 per carton.  Zhao testified he believed, at the time he entered the transaction, the customs charge would be 3% of the stated purchase price, not the 6.4% actually charged, resulting in L.A. Victory's incurring an unexpected additional charge of $8816.37, i.e, an extra $0.60 per carton.  (See Ex. 747:23 - 748:16; Defs.' Closing Argument at 7-8.)  Even if one accepts Zhao's testimony that he did not expect to pay the extra $0.60 per carton,[25] Zhao still would have needed some basis for believing L.A. Victory could sell the cartons for more than $20.58 ($17.70 + $3.48 - $0.60).  Zhao testified at his

----

[24]In response to the question, "When did you plan to pay off the balance to Cheuking?," Zhao testified, "As long as my cash flow is in control."  (See Tr. 749:1-2.)

[25]Zhao testified he had not previously imported hoisin sauce, but that he had previously imported soy sauce, for which he was charged a 3% customs charge.  Koon Chun did not dispute that a 3% customs charge applies to soy sauce.  According to Zhao, based on his past experience with importing soy sauce, he believed the customs rate applicable to hoisin sauce likewise would be 3%.

1    deposition, however, that before he delivered the purchase order to Cheuking, he had

2    "asked people" and was advised by some that he could sell a carton of hoisin sauce for

3    $20, while others advised him he could sell a carton for $20.50.  (See Tr. 338:22 - 339:17.)

4    Thus, at the purported price of $17.70 per carton, Zhao would have known that even if he

5    sold every carton for $20.50, L.A. Victory could not make a profit on such transaction.[26]

6          For the above reasons, the Court finds L.A. Victory and Cheuking did not intend that

7    L.A. Victory pay more than the price paid before the goods were shipped, specifically,

8    $136,100, or $9.29 per carton, a price substantially below the price for genuine Koon Chun

9    products.  A discrepancy of such magnitude is, by itself, sufficient to make Zhao aware of a

10   high probability the goods were not genuine Koon Chun products.

11         Other evidence offered by Koon Chun supports such finding as to Zhao's

12   knowledge.  Zhao testified that after learning he had been sued, he took no steps to

13   challenge Cheuking about the transaction, other than to ask Chen on one occasion about

14   the authenticity of the goods.  (See Tr. 638:15 - 639:13.)  Further, nowhere in the document

15   he prepared with respect to the sales of the goods, specifically, L.A. Victory's purchase

16   order and its invoices to buyers, did Zhao ever refer to "Koon Chun hoisin sauce"; rather

17   such documents reference only "sauce" or "hoisin sauce."  (See Exs. 78, 348-Q, 348-R,

18   348-S, 348-T, 349-F, 349-G, 350-I, 350-J, 350-K, 351-P.)  Moreover, in a ledger Zhao kept

19   to identify payments made by and received by L.A. Victory, (see Tr. 481:19 - 483:9), Zhao

20   entered the payee of the $136,100 as "H.K. Company," (see Ex. 33 at 72:36, 73:7), not as

21   Cheuking or an abbreviation appropriate to Cheuking; by contrast, in recording other

22   transactions in his ledger, Zhao named the specific payee, or used an abbreviation

23   appropriate to the payee, such as "Sam A.F. Company," "Benz," "Cathay Source," "L.C.

24   _____

25         [26]At trial, Zhao asserted that, at the time he entered into the transaction with
     Cheuking, his "plan was that [he] would sell them on the West Coast for $21 and [on] the
26   East Coast for $22," which plan was based on a "very authoritarian person" having advised
     him the West Coast price "would be $21, 20.50 to 21," and Zhao's belief that a $22 price on
27   the East Coast would be "reasonable" due to higher shipping costs.  (See Tr. 338:12-20.)
     When confronted with his earlier testimony that he had expected to sell the cartons for $20
28   or $20.50, Zhao failed to offer a credible explanation as to his changed recollection.  (See
     Tr. 339:19 - 340:15.)

1  Shipping," "Apollo Towing Company," "CN Link," "Avanta Bank," "America Food," and "Yue

2  Kai Company," (see, e.g., id. at 73).  Similarly, in all but one of the entries for the

3  transactions in which L.A. Victory received payments for the hoisin sauce, Zhao did not

4  describe the goods as "Koon Chun hoisin sauce," or even "hoisin sauce," but, rather, as

5  "soy sauce," (see id. at 75:23, 76:27, 78:1, 80:1), or "rice vermicelli," (see id. at 76:31,

6  78:1).[27]

7         Accordingly, the Court finds Zhao and L.A. Victory, at the time Zhao purchased the

8  products at issue, knew the goods were counterfeit.

9         Defendants argue that if the Court finds defendants knew the goods were

10  counterfeit, the Court nonetheless should decline to award treble damages, because of the

11  presence of extenuating circumstances.  See 15 U.S.C. § 1117(b) (providing district court

12  "shall, unless the court finds extenuating circumstances" award treble damages).

13         Courts have recognized that "extenuating circumstances" are "intended for extreme

14  cases," for example, where "imposition of treble damages would mean the defendant would

15  be unable to support his or her family."  See Louis Vuitton S.A., 875 F. 2d at 590 (7th Cir.)

16  (citing legislative history); see also Levi Strauss & Co. v. Shilon, 121 F.3d 1309, 1314 (9th

17  Cir.1997) (citing favorably to Louis Vuitton S.A.; stating, with reference to

18  § 1117(b)'s provision for "extenuating circumstances," "the exception is extremely narrow").

19         The defense of extenuating circumstances is an affirmative defense. See Louis

20  Vuitton S.A., 875 F. 2d at 590.  Defendants did not plead the affirmative defense of

21  extenuating circumstances, or include any reference to such defense in their pretrial filings.

22  The first time the matter was brought to the Court's attention was in defendants' closing

23  argument.  Although, as defendants note, evidence relevant to such issue was admitted

24  without objection,[28] the record contains no indication that Koon Chun was aware the

25  _____

26  [27]As to one payment received from Eastimpex, Zhao wrote in his ledger that the
    payment was for "hoisin sauce."  (See id. at 79:15.)

27  [28]Defendants rely on Zhao's testimony concerning his present financial situation,
28  specifically, that (1) L.A. Victory owes payments on a bank loan of $100,000, (2) another
    company owned by Zhao, Cathay Source U.S.A., Inc., owes a bank $85,000, (3) to pay his

21

1   defense of extenuating circumstances was being raised, let alone that Koon Chun was

2   provided the opportunity to take discovery with respect to such defense.  Under such

3   circumstances, the Court deems the defense waived.  Cf. id. (holding where defendant did

4   not "plead or otherwise present[ ]" affirmative defense of extenuating circumstances," and

5   first raised issue on appeal, defense waived).

6       Accordingly, pursuant to § 1117(b), the Court finds Koon Chun is entitled to treble

7   damages, specifically, $775,764.90 ($258,588.30 x 3).

8       **4.  Statutory Damages**

9       "In a case involving the use of a counterfeit mark . . ., the plaintiff may elect, at any

10  time before final judgment is rendered by the trial court, to recover, instead of actual

11  damage and profits . . . , an award of statutory damages for any such use in connection

12  with the sale, offering for sale, or distribution of goods or services in the amount of . . .

13  (1) not less than $500 or more than $100,000 per counterfeit mark per type of goods or

14  services sold, offered for sale, or distributed, as the court considers just; or (2) if the court

15  finds that the use of the counterfeit mark was willful, not more than $1,000,000 per

16  counterfeit mark per type of goods or services sold, offered for sale, or distributed, as the

17  court considers just."  15 U.S.C. § 1117(c).

18      Here, Koon Chun seeks, in the alternative to an award of defendants' profits and

19  Koon Chun's actual damages, an award of statutory damages in the maximum amount,

20  and requests that the Court set a deadline by which Koon Chun may make an election.

21  Because the Court has found the use of the counterfeit mark was intentional, and was used

22  on one type of product, the maximum possible statutory award is, as Koon Chun points out,

23  $1,000,000.  See id.

24      In determining the amount of statutory damages to award, courts have considered

25

26  debts, Zhao sold his house and moved into an apartment with his wife and two daughters,
    who are in school, (4) customers are "afraid" to do business with him, (5) persons who
27  used to give him credit have stopped, and (6) Zhao has no income or business, is looking
    for a job, but has few prospects given that he speaks limited English and is over 50.  (See
28  Tr. 749:16 - 750:15.)

1    such factors as "restitution of profit," "reparation of injury," and "deterrence of future

2    infringement."  See Philip Morris USA, 352 F. Supp. 2d at 1076 (citing cases).  As one court

3    has observed, "[t]he statutory damages provision was added in 1995 because

4    counterfeiters' records are frequently nonexistent, inadequate, or deceptively kept, making

5    proving actual damages in these cases extremely difficult if not impossible."  See Tiffany

6    (NJ) Inc. v. Luban, 282 F. Supp. 2d 123, 124 (S.D. N.Y. 2003) (internal citation and

7    quotation omitted).  In the instant case, as defendants observe, Koon Chun obtained

8    detailed records of L.A. Victory's activities, which enabled Koon Chun to establish, with

9    precision, both the profits realized by L.A. Victory and the number of sales Koon Chun lost.

10   Thus, an award of statutory damages in excess of the above-referenced actual damages is

11   not necessary to address such factors as restitution of profit and reparation of injury.[29]

12          Further, Koon Chun, based on one of Cheuking's invoices to L.A. Victory obtained

13   during the course of discovery herein, was able to contact the source from whom L.A.

14   Victory purchased the counterfeit goods and to obtain evidence of possible other acts of

15   infringement by Cheuking.  (See Tr. 656:4-11, 658:12, 661:23 - 676:19; Ex. 383.)  Thus,

16   the instant case does not involve a situation wherein maximum statutory damages are

17   appropriate due to a defendant's refusal to provide information about the source of the

18   counterfeit goods.  Cf. Philip Morris USA, 352 F. Supp. 2d at 1076 (holding statutory award

19   of $10,000 for non-willful infringement would deter future infringement where defendant

20   "refused to voluntarily cooperate with [p]laintiff's efforts to identify their source of supply").

21   The instant case does, however, involve willful sales of counterfeit goods meant for

22   consumption, and, although there have been no reports of any ill effects resulting from the

23   consumption of such goods, a statutory award nonetheless should be of sufficient

24   magnitude to deter future sales of counterfeit food products by others.  Under such

25

26          [29]Many of the cases cited by Koon Chun pertain to a defendant in default, which
     situation almost invariably will present difficulties in establishing the defendant's actual
27   profits and the plaintiff's actual losses.  See, e.g., Tiffany (NJ) Inc., 282 F. Supp. 2d at 124.
     To the extent Koon Chun may not have been awarded the full extent of the damages it
28   sought herein, the reason was due to Koon Chun's decision not to offer proof within its
     control, not to any failure by defendants to provide discovery.

1    circumstances, the Court finds a statutory award of $550,000 is adequate.

2        Accordingly, the Court will award Koon Chun, in the alternative to an award based

3    on defendants' profits and Koon Chun's actual damages, statutory damages of $550,000.

4        **5.  Attorneys' Fees and Costs**

5        In light of defendants' having been found to have intentionally used Koon Chun's

6    Trademark, knowing the goods it sold were counterfeit, and the issue of extenuating

7    circumstances having been waived, defendants are liable for Koon Chun's reasonable

8    attorney's fees.  See 15 U.S.C. § 1117(b).  Further, defendants are liable for Koon Chun's

9    costs.  See 15 U.S.C. § 1117(a).

10       Accordingly, the Court will award Koon Chun its reasonable attorney's fees and

11   costs, according to proof.

12       **6.  Offset**

13       As noted, the Court has found Koon Chun's actual damages are $258,588.30.  As to

14   that amount, all defendants named herein are jointly and severally liable.  See Frank Music

15   Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F. 2d 505, 519 (9th Cir. 1985) (holding each

16   defendant is "severally liable for his own illegal profit," but "all infringers are jointly and

17   severally liable for plaintiffs' actual damages").

18       In the instant action, all of the named defendants, with the exception of L.A. Victory,

19   Zhao, and America Food Int'l Corp. ("AFI"),[30] have previously settled with Koon Chun.[31]  In

20   their closing argument, defendants argue that the amount of damages for which they are

21   found liable should be offset by any settlements received by Koon Chun from the other

22   defendants, but do not propose a procedure for making such a determination, other than

23   suggesting the matter be considered in a "closed proceeding" in light of the confidentiality

24   of the settlements.  (See Defs.' Closing Argument and Brief at 31:25 - 32:4.)  In a pretrial

25

26       [30]By separate order filed concurrently herewith, the Court has granted Koon Chun's
     motion for default judgment against AFIC.
27

28       [31]The settling defendants are Eastimpex, EBJ Wholesale Corporation, Giant Union,
     Well Luck Co., Inc., and Super Luck Co., Inc.

filing, Koon Chun conceded that L.A. Victory and Zhao may be entitled to an offset, depending on the amount of damages awarded at trial, and recommended that the issue of offsets be determined in a post-trial proceeding, but likewise did not suggest a procedure for such determination.  (See Pl.'s Mem. Of Law Concerning Damages, filed May 22, 2006, at 10:27, 12:26 - 13:2.)

Accordingly, the parties will be directed to meet and confer and submit a stipulation regarding the procedure to be employed in determining whether and/or in what amount an offset is appropriate in light of the prior settlements, or, if the parties are unable to stipulate as to such procedure, to submit separate proposals.

**CONCLUSION**

For the reasons stated above, the Court finds Koon Chun is entitled to judgment against L.A. Victory and Zhao on the claims set forth in the Second Amended Complaint, as follows:

1.  Koon Chun is entitled to a permanent injunction and destruction order.  The parties shall meet and confer and submit, no later than March 2, 2007, a proposed permanent injunction and destruction order; alternatively, if the parties are unable to stipulate as to such language, the parties are to submit separately proposed language by that date.

2.  Koon Chun is entitled to an award of $78,856.49 in profits against L.A. Victory and Zhao.

3.  Koon Chun is entitled to an award of $775,764.90 in treble damages against L.A. Victory and Zhao, less any offset to which L.A. Victory and Zhao are entitled.  The parties shall meet and confer, no later than March 2, 2007, and submit a proposed procedure to be used by the Court in determining whether and/or in what amount an offset is available; alternatively, if the parties are unable to stipulate as to such procedure, the parties are to submit separate proposals by that date.

4.  As an alternative to the monetary awards set forth above, Koon Chun is entitled to an award of $550,000 in statutory damages against L.A. Victory and Zhao.  After the

Court has determined whether L.A. Victory and Zhao are entitled to an offset as to the award of actual damages, the Court will set a deadline for Koon Chun to elect to receive either an award based on profits and treble damages or an award based on statutory damages.

5.  Koon Chun is entitled to an award of its reasonable attorney's fees and costs, according to proof.  No later than 14 days after entry of final judgment, Koon Chun shall file a motion for an award of attorney's fees and costs and/or bill of costs.  See Civil L.R. 54-1(a), 54-6(a).  Final judgment will be entered upon resolution of the issue of offsets and Koon Chun's election as to an award of actual or statutory damages.

**IT IS SO ORDERED.**

Dated: February 2, 2007

_____
MAXINE M. CHESNEY
United States District Judge